J-S17030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JABRIEL ALLEN | : | |
| | : | |
| Appellant | : | No. 1744 EDA 2023 |

Appeal from the PCRA Order Entered June 16, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000395-2019,
CP-51-CR-0002410-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JABRIEL ALLEN | : | |
| | : | |
| Appellant | : | No. 1745 EDA 2023 |

Appeal from the PCRA Order Entered June 16, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000395-2019,
CP-51-CR-0002410-2018

BEFORE: BOWES, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.: **FILED JULY 2, 2024**

Appellant, Jabriel Allen, appeals from the order entered in the Philadelphia County Court of Common Pleas, which denied his first petition filed under the Post Conviction Relief Act ("PCRA").[1] We affirm.

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

A prior panel of this Court set forth the relevant facts and procedural history of this case as follows:

> On the evening of February 28, 2018, as Emmanuel White entered the lobby of an apartment building located at 4445 Holden Street, Philadelphia, Pennsylvania, Devoune Handy struck him over the head with his cane multiple times, forcing him to the ground. Appellant was present in the lobby when the altercation occurred, and he eventually intervened to separate the two men, who had days earlier been involved in a family disagreement. Handy later testified that he did not know Appellant at the time, but the videotape showed Appellant shaking Handy's hand when he entered the lobby.
>
> White stood up and Handy attempted to shake his hand, suggesting that the fight was over. White refused the handshake and, instead, produced a knife and chased Handy toward the door exiting the lobby. Upon catching up with Handy, White stabbed him twice, in the shoulder and in his flank. Handy ran into the parking lot outside of the building with White in pursuit, and then collapsed in the grass. As White stood over Handy with the knife in his hand, Appellant drew a .40 caliber Smith and Wesson handgun and fired two shots at White's back. White ran, and Appellant chased him through the parking lot, shooting him five more times in the back. White collapsed with the knife still in his hand and later succumbed to his wounds. Handy survived the stabbing.
>
> Immediately after the shooting, Appellant pulled up the hood of his sweatshirt, ran back into the lobby of the apartment building, and exited through the fire door. Two days later, he traded the handgun used in the shooting for a different firearm.
>
> Officer Barry Stewart of the Philadelphia Police Department responded to the scene shortly after the shooting, observed Handy lying on the ground bleeding, and arranged for transport for immediate medical attention. Handy later talked to investigators about the incident and pled guilty to simple assault for his attack upon White.

- 2 -

Officers Shannon Shippey and Alex Breyer of the Philadelphia Police Department were stationed near the Holden building at the time of the incident. The officers heard gun shots and immediately went to the scene. Upon arrival, the officers saw White lying on the ground with the knife still in his hands. Officer Breyer removed the knife from White's hands and transported him to a nearby hospital for treatment of multiple gunshot wounds, but White was later pronounced dead.

Catena Grey, a security guard stationed in a booth in the lobby of the Holden building, was on duty at the time of the shooting. Ms. Grey testified that she witnessed the fight in real time through the security cameras airing in the booth, but she did not intervene because such altercations were frequent and protocol dictated that she not leave the booth. She observed video depicting White, Handy, and a crowd of bystanders exiting the building and, soon thereafter, she heard gunshots. Moments later she saw a hooded male return through the lobby while carrying a pistol.

Security footage from cameras located both in the lobby and outside of the apartment building was recovered by Detective Ohmarr Jenkins and turned over to Detective Thorsten Lucke, who created a compilation of the incident. The footage was played and narrated by Detective Lucke during Appellant's bench trial. The video depicted the initial altercation, the men exiting the building, and then multiple flashes of a muzzle. Surveillance footage also depicted a male, later identified as Appellant, re-entering the lobby with something in his hands as the police arrived.

An autopsy of White was performed by Dr. Daniel Brown. His report, the decedent's hospital records, and the investigative reports were subsequently reviewed by Dr. Lindsay Simon, an expert in forensic pathology. Dr. Simon testified that the manner of White's death was a homicide, and the cause of death was multiple gunshot wounds. Dr. Simon concluded that he had been shot six times in the back.

Appellant was arrested and charged with murder and related weapons offenses in connection with these events. He was

also charged at a separate docket number with firearm offenses charges associated with a different gun that was found on his person at the time of his arrest. At a bench trial held on March 2, 2020, the trial court found Appellant guilty of third-degree murder, [possessing instruments of crime ("PIC")], and the related weapons charges. On August 28, 2020, Appellant pled guilty at the second docket number to the weapons charges arising from his arrest. That same day, Appellant was sentenced to an aggregate term of twenty to forty years of imprisonment on the third-degree murder, PIC, and weapons convictions related to the shooting on February 28, 2018. The court also sentenced him to a consecutive term of two to four years of imprisonment for the firearms violations associated with his arrest [resulting in an aggregate sentence of 22 to 44 years' imprisonment]. Appellant filed a timely post-sentence motion, which the trial court denied.

*Commonwealth v. Allen*, No. 1830 EDA 2020 and No. 1831 EDA 2020, unpublished memorandum at 2-5 (Pa.Super. filed July 28, 2021) (internal citations omitted), *appeal denied*, ___ Pa. ___, 270 A.3d 1102 (2022). This Court affirmed Appellant's judgment of sentence on July 28, 2021, and our Supreme Court subsequently denied his petition for allowance of appeal. *See id.*

On March 23, 2022, Appellant timely filed a *pro se* PCRA petition. The PCRA court appointed counsel, who subsequently filed a *Turner/Finley*[2] no-merit letter and motion to withdraw. The court issued Pa.R.Crim.P. 907 notice on June 13, 2022. Appellant filed a response to the notice, alleging PCRA counsel's ineffectiveness. On November 3, 2022, the PCRA court granted counsel leave to withdraw and appointed new counsel, who subsequently filed

_____

[2] *Commonwealth v. Turner*, 518 Pa. 491, 544 A.2d 927 (1988) and *Commonwealth v. Finley*, 550 A.2d 213 (Pa.Super. 1988) (*en banc*).

an amended PCRA petition. On December 15, 2022, the Commonwealth filed an answer to the amended PCRA petition. The PCRA court granted Appellant an evidentiary hearing.

On March 24, 2023, the day of PCRA hearing, Appellant requested permission to file a supplemental petition. The PCRA court granted Appellant permission to supplement his amended petition and bifurcated the hearing for testimony regarding Appellant's new claim. The PCRA court summarized the relevant testimony from the hearings as follows:

> On April 12, 2019, trial counsel, Gary Server, Esq. [("trial counsel")], was appointed to represent [Appellant] and met with him in person at least five times for trial preparation. On April 27, 2019, [trial counsel] met with [Appellant] for the first time and explained the charges and possible defenses, including justification. At [the] initial meeting, [Appellant] admitted to shooting the decedent but thought the shooting was justified. [Thereafter, Appellant informed trial counsel he wanted to] change his trial strategy by denying that he was the shooter [but claiming] he merely picked up the gun after the unknown shooter fled. On February 22, 2020, less than two weeks before trial, [Appellant] ultimately abandoned that strategy and [informed trial counsel] to proceed with the justification defense[.]
>
> [Contrary to Appellant's assertions, he] never told [trial counsel] that he had a special relationship with Handy and merely told [trial counsel] that he knew Handy from the neighborhood. [Trial counsel] never instructed [Appellant] to lie about his relationship with Handy at trial and properly prepared him to testify[.] While preparing defendants to testify, [trial counsel] does not rehearse questions with defendants to prevent testimony from sounding rehearsed and weakening the case.
>
> Contrary to his claim, [Appellant] never told [trial counsel] about any previous acts of violence the decedent allegedly

committed and only told [trial counsel] that he knew the decedent from the neighborhood. [Trial counsel] first learned about the decedent's previous confrontation with Handy during trial when Handy testified that the decedent threatened him with a knife a few days before the murder. [Appellant's] claim that he saw the decedent assault someone in 2017 and was present for the initial confrontation between Handy and the decedent was incredible.

On three different occasions, [trial counsel] properly ensured that [Appellant] understood his right to a jury trial and how it differs from a bench trial. After [Appellant] rejected the Commonwealth's offer of a non-trial disposition on the record on February 14, 2020, [trial counsel] discussed with [Appellant] about proposing a counteroffer to the Commonwealth to proceed with a bench trial in exchange for the Commonwealth dropping the First-Degree Murder charge on February 22, 2020. On February 29, 2020, [trial counsel] informed [Appellant] that the Commonwealth had agreed to the counteroffer and [Appellant] agreed to waive his right to a jury trial. On March 2, 2023, [Appellant] reviewed and completed the Written Jury Trial Colloquy Form with [trial counsel] before appearing before [the trial court] and electing to proceed with a bench trial.

\* \* \*

[In 2018,] Handy was arrested and charged with Aggravated Assault and related offenses for hitting the decedent with his cane. Bail was set at ten percent of $50,000 and two detainers were lodged against Handy in [two 2008 cases] because he was on probation for two First-Degree Felony Robbery cases[.]

Former ADA Matthew Krouse, Esq., was assigned to investigate the decedent's death and subsequently, Handy's Aggravated Assault case.[2] Charles Auspitz, Esq., Handy's attorney, informed ADA Krouse that Handy would be willing to cooperate with the homicide investigation but the parties never formed an agreement regarding the homicide.

_____
[2] After [Appellant] was arrested on November 7, 2018

- 6 -

and ADA Krouse approved the charges, the case was assigned to another ADA.

On April 19, 2018, in the Aggravated assault case before the Honorable Marvin Williams, ADA Krouse agreed to reduce bail to house arrest because of the myriad of mitigating factors in the case including that Handy was stabbed during the incident, he was previously injured, and his previous convictions were over ten years old at the time. On that same day, in the 2008 cases, Judge Palumbo lifted the detainers without any involvement by ADA Krouse.[3] ADA Driscoll was the ADA in the room and he did not discuss the 2008 cases with ADA Krouse.

> [3] On April 18, 2018, Judge Palumbo continued the 2008 cases to April 19, 2018.

On May 9, 2018, Handy was taken into custody because the GPS monitoring system lost power during the night. On May 14, 2018, Handy's house arrest was reinstated without Commonwealth objection.

On May 22, 2018, Handy, accompanied by Auspitz, was interviewed by ADA Krouse in the presence of a Homicide Detective. Handy did not provide any new information or make an identification, so the meeting was not documented. On May 28, 2018, Auspitz emailed ADA Krouse acknowledging that the proffer "did not bear any fruit."

On September 24, 2018, in a [Pa.R.Crim.P. 701] consolidation in the Aggravated Assault case, Judge Palumbo dismissed the Aggravated Assault charge for a lack of evidence over ADA Krouse's objection. That same day, Handy pled guilty to Simple Assault and related charges and Judge Palumbo sentenced him to time served to twenty-three months of incarceration with a probationary tail over ADA Krouse's recommendation of a jail time sentence. In the 2008 case, Judge Palumbo resentenced Handy to concurrent terms of fourteen years of probation.

(PCRA Court Opinion, filed June 16, 2023, at 6-8) (internal citations omitted).

On April 27, 2023, the PCRA court held the matter under advisement

and requested post-hearing briefing from the parties. On June 16, 2023, the PCRA court denied relief. On July 2, 2023, Appellant timely filed notices of appeal at each underlying docket, which this Court consolidated *sua sponte*. The PCRA court did not order, and Appellant did not file, a Pa.R.A.P. 1925(b) statement.

On appeal, Appellant raises the following issues for our review:

> Whether the PCRA Court erred as a matter of law and abused its discretion in failing to award [Appellant] a new trial based on the Commonwealth's failure to turnover impeachment evidence in violation of **Brady/Giglio**?[3]

> Whether trial counsel was ineffective for failing to consult with [Appellant] about trial strategy and trial testimony?

> Whether trial counsel was ineffective for failing to object to the medical examiner's report without the testimony of its author?

> Whether trial counsel was ineffective for failing to subpoena [Handy's] medical records related to the stabbing?

(Appellant's Brief at viii) (suggested answers omitted).

Our standard of review of the denial of a PCRA petition is limited to examining whether the record evidence supports the court's determination

---

[3] **See Brady v. Maryland**, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding suppression by prosecution of evidence favorable to accused upon request violates due process where evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of prosecution). **See also United States v. Giglio**, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (holding prosecutor's promise of non-prosecution in exchange for cooperation is attributable to government, regardless of whether prosecutor had authority to make it or whether trial prosecutor was aware of promise, and nondisclosure of promise constitutes violation of due process).

and whether the court's decision is free of legal error. ***Commonwealth v. Ford***, 947 A.2d 1251 (Pa.Super. 2008), *appeal denied*, 598 Pa. 779, 959 A.2d 319 (2008). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. ***Commonwealth v. Boyd***, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. ***Commonwealth v. Dennis***, 609 Pa. 442, 17 A.3d 297 (2011).

In his first issue, Appellant argues that the Commonwealth withheld impeachment evidence in violation of ***Brady/Giglio***. Appellant claims the Commonwealth withheld evidence that: 1) it had given Handy the benefit of pretrial release; 2) Handy had met with the DA's Office and homicide detectives to seek leniency; 3) the Commonwealth considered Handy a suspect; and 4) Handy had declined to turn over his cell phone for forensic examination.[4] Appellant contends that the Commonwealth withheld relevant emails between the Commonwealth and Handy's attorney until PCRA counsel requested them. Appellant insists that he would have used this information to impeach Handy's credibility and establish that Handy had perjured himself at trial by stating that he had not received a benefit for his testimony.

_____

[4] Specifically, Appellant contends that Handy received a benefit where the trial court reduced his bail and lifted his detainers. While Appellant admits that there was no express agreement by the Commonwealth to reduce Handy's bail and lift the detainers in exchange for Handy's testimony, Appellant suggests that Handy's testimony was influenced by the Commonwealth's "friendly gesture." (Appellant's Brief at 19-20).

Appellant submits he suffered prejudice as a result of the Commonwealth's violations, because Handy was the only witness who could identify Appellant from the video. Appellant concludes he is entitled to a new trial on these grounds. We disagree.

"Under **Brady** and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." **Commonwealth v. Roney**, 622 Pa. 1, 22, 79 A.3d 595, 607 (2013), *cert. denied*, 574 U.S. 829, 135 S.Ct. 56, 190 L.Ed.2d 56 (2014). "To establish a **Brady** violation, an appellant must prove three elements: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued." **Id.** The defendant must establish all three prongs of the **Brady** claim to prove entitlement to relief. **Commonwealth v. Murray**, 174 A.3d 1147, 1152 (Pa.Super. 2017). "[N]o **Brady** violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." **Commonwealth v. Bagnall**, 661 Pa. 123, 150, 235 A.3d 1075, 1091 (2020) (citation omitted).

A **Brady** violation exists:

> [O]nly where the suppressed evidence is material to guilt or punishment, *i.e.*, where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. In determining whether a reasonable probability of a different outcome has

- 10 -

been demonstrated, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). A "reasonable probability" of a different result is shown when the government's suppression of evidence "undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

*Commonwealth v. Cousar*, 638 Pa. 171, 195, 154 A.3d 287, 301 (2017) (some internal citations omitted).

Instantly, the PCRA court addressed Appellant's *Brady* claim as follows:

[Appellant's] *Brady* claim fails because he failed to show that any deal regarding Handy's pre-trial release in exchange for his testimony at trial existed. …

Before the attempted proffer even took place, on April 19, 2018, in the Aggravated Assault case, the Commonwealth agreed to reduce bail to house arrest because of the many mitigating circumstances in the case including that Handy was stabbed during the incident, that Handy was previously injured, and that his previous convictions were over ten years old at the time. Merely because the detainers were lifted in the 2008 cases on the same day Handy's bail was reduced is insufficient to establish an undisclosed agreement with the Commonwealth because VOP hearings are routinely scheduled on the same day as the defendant's open matter.

While Handy did meet with the Commonwealth, almost a month later, he provided no new information to the Commonwealth as evidenced by Auspitz's acknowledgement that the proffer "did not bear any fruit." Judge Palumbo later dismissed the Aggravated Assault charge and sentenced Handy to time served, against ADA Krous[e]'s recommendation, further demonstrating the lack of an agreement between Handy and the Commonwealth.

[Appellant] cannot meet his burden by showing that Handy received a beneficial outcome in a case because he must establish that Handy received the benefit **in exchange** for his testimony at trial. At trial, Handy testified that he did not receive a benefit for his testimony, testified to the disposition of the above cases, and his criminal extract was admitted as an exhibit at trial. Furthermore, while it may have been the best practice in an abundance of caution to disclose the communications, [Appellant] cannot establish prejudice since Handy passed out after being stabbed, so he did not witness [Appellant] shooting the decedent. Handy's testimony served only as a benefit to [Appellant] since it established the extent of Handy's injuries caused by the decedent.

In his post-hearing brief, [Appellant] attempts to claim that Handy's statement at trial that he felt harassed to come to court by the Commonwealth shows that he received some kind of benefit, is complete conjecture. There is no evidence before this [c]ourt to show that Handy's statements were connected to him being released on house arrest almost two years ago, especially considering it was Handy's attorney who reached out to the Commonwealth. Additionally, on February 14, 2020, Handy appeared before this [c]ourt to receive a subpoena for trial and demonstrated his extreme reluctance to testify in this case. After receiving his subpoena, the assigned ADA reported that she heard Handy loudly ranting by the elevators his displeasure about appearing in court, including saying that "they can suck my dick about appearing in court."

[Appellant's] argument in his post-hearing brief that Auspitz's March 15, 2018 email provides Handy with a motive to kill the decedent is irrelevant because [Appellant] admitted to shooting the decedent, allegedly because he feared for Handy's life. Additionally, the information about the alleged motive could not have been used to impeach Handy because it was not Handy's statement.

[Appellant] also attempts to argue that Auspitz's March 15, 2018 email identifies two witnesses unknown to the defense. On the contrary, the email states that Handy's ex[-]paramour and her mother could identify the decedent and Handy on the surveillance footage of the incident, not

that they were present for the incident itself. The mere fact that other people were capable of identifying Handy and the decedent on the surveillance footage is irrelevant because both [Appellant] and Handy identified themselves and the decedent on the footage.

(PCRA Court Opinion at 14-17) (internal citations omitted) (emphasis in original). The record supports the PCRA court's conclusion that no *Brady* violation occurred. *See Ford, supra*; *Boyd, supra*. Although Handy met with the Commonwealth, the "benefits" he received were prior to and entirely unrelated to that meeting. *See Roney, supra*. Thus, Appellant's first issue merits no relief.

Appellant's remaining issues implicate the effective assistance of counsel. In his first claim of ineffectiveness (Appellant's second issue on appeal), Appellant argues that trial counsel failed to consult with Appellant about trial strategy and testimony. Appellant claims that trial counsel advised Appellant against disclosing his close friendship with Handy, and counsel failed to introduce evidence of the decedent's reputation for violence. According to Appellant, because the case hinged on self-defense, trial counsel had no reasonable basis for these actions. Finally, Appellant asserts that he was prejudiced by counsel's failure because there is "no doubt that [the] near-familial relationship [between Appellant and Handy] would have impacted [Appellant's] narrative at trial." (Appellant's Brief at 23). Appellant concludes trial counsel was ineffective on these grounds, and this Court must grant relief. We disagree.

"Counsel is presumed to have rendered effective assistance."

***Commonwealth v. Hopkins***, 231 A.3d 855, 871 (Pa.Super. 2020), *appeal denied*, 663 Pa. 418, 242 A.3d 908 (2020).

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

***Commonwealth v. Sandusky***, 203 A.3d 1033, 1043 (Pa.Super. 2019), *appeal denied*, 654 Pa. 568, 216 A.3d 1029 (2019) (internal citations and quotation marks omitted). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. ***Commonwealth v. Chmiel***, 612 Pa. 333, 30 A.3d 1111 (2011).

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit[.]" ***Commonwealth v. Pierce***, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." ***Commonwealth v. Poplawski***, 852 A.2d 323, 327 (Pa.Super. 2004) (citation omitted).

"Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his

- 14 -

client's interests." ***Commonwealth v. Kelley***, 136 A.3d 1007, 1012 (Pa.Super. 2016) (quoting ***Pierce, supra*** at 524, 645 A.2d at 194-95).

> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

***Commonwealth v. King***, 259 A.3d 511, 520 (Pa.Super. 2021) (quoting ***Sandusky, supra*** at 1043-44).

"To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." ***Commonwealth v. Spotz***, 624 Pa. 4, 33-34, 84 A.3d 294, 312 (2014) (internal citations and quotation marks omitted). "[A] criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." ***Hopkins, supra*** at 876 (quoting ***Commonwealth v. Chambers***, 570 Pa. 3, 22, 807 A.2d 872, 883 (2002)).

The PCRA court addressed Appellant's first ineffectiveness claim as follows:

> [Trial counsel] adequately consulted with [Appellant] about trial strategy because at his very first meeting with

- 15 -

[Appellant] he explained the justification defense. At the hearing, [Appellant] acknowledged that [trial counsel] explained his possible defenses in the case and how the "best case" for the defense would be to argue self-defense. Despite this explanation, [Appellant] was the one who attempted to change his trial strategy by ridiculously claiming that he merely picked up the firearm after the shooting occurred despite his original explanation to [trial counsel] and the surveillance video. It was not until February 22, 2020, that [Appellant] told [trial counsel] that he was abandoning this strategy and wished to proceed with the justification defense. [Trial counsel] more than adequately consulted with [Appellant] regarding trial strategy and [Appellant] cannot establish how further consultation regarding trial strategy would have changed the outcome of his trial, so his claim fails.

(PCRA Court Opinion at 11-13).

The record supports the PCRA court's conclusions. Additionally, the record elicited at the evidentiary hearing reflects that Appellant failed to inform trial counsel about his relationship with Handy or the decedent's reputation for violence. According to trial counsel, he first learned about the prior confrontation between Handy and the decedent during Handy's trial testimony. The PCRA court credited trial counsel's testimony and found Appellant's claim incredible. As this determination is supported by the record, we will not disturb it on appeal. *See Dennis, supra*. On this record, Appellant cannot succeed on his ineffectiveness claim based on trial counsel's alleged failure to prepare him for trial, because it lacks arguable merit. *See Pierce, supra*.

In his second claim of ineffective assistance (Appellant's third issue on appeal), Appellant argues that trial counsel failed to object to the admission

of the medical examiner's report without the testimony of its author. Appellant contends that this testimony violated the Confrontation Clause of the Sixth Amendment of the United States Constitution. Appellant submits that counsel had no reason for failing to object, and that Appellant suffered prejudice because the Commonwealth referenced the back wounds in the medical examiner's report numerous times to emphasize that Appellant and Handy were not in immediate danger when the victim was shot. Appellant concludes trial counsel was ineffective on these grounds, and this Court must grant relief. We disagree.

Our Supreme Court has explained:

> Pennsylvania law requires the preparation of autopsy reports in all cases of sudden, violent, and suspicious deaths, or deaths by other than natural causes…to determine whether the death occurred as the result of a criminal act, and that coroners conducting such autopsies must consult and advise the local district attorney to the extent practicable[.] [The] primary purpose for preparation of an autopsy report is to establish or prove past events potentially relevant to a later criminal prosecution[.]

***Commonwealth v. Weeden***, ___ Pa. ___, 304 A.3d 333 (2023) (internal citations and quotations omitted). Therefore, in cases where the author of the autopsy report was not available to testify, and where the testifying medical expert was not present at the autopsy, admission of such a report violates the Confrontation Clause. ***See Commonwealth v. Brown***, 646 Pa. 396, 400-01, 185 A.3d 216, 318-19 (2018). Nevertheless, our Supreme Court has also held that a medical expert "who did not perform the autopsy may

testify as to cause of death as long as the testifying expert is qualified and sufficiently informed." *See Commonwealth v. Ali*, 608 Pa. 71, 111-12, 10 A.3d 282, 306-07 (2010). An expert who "properly formed an independent opinion, and was available to be cross-examined regarding the basis of that opinion," does not constitute a Confrontation Clause violation. *Brown, supra* at 423.

The PCRA court addressed Appellant's second ineffectiveness claim as follows:

> Trial counsel was not ineffective for failing to object to the admission of the coroner's report because the report was not admitted into evidence at trial. Dr. Daniel Brown preformed the decedent's autopsy but Dr. Lindsay Simon, Associate Medical Examiner, testified at trial. Only Dr. [Simon's] report was admitted into evidence at trial as Commonwealth's Exhibit 55 and not Dr. Brown's coroner's report. Dr. [Simon] utilized Dr. Brown's report, autopsy photos, and hospital records to form her independent opinion made to a reasonable degree of scientific certainty. The Medical Examiner clearly demonstrated her independent opinion and did not simply "parrot" the author of the coroner's report's conclusions since she disagreed with the author's conclusion regarding the path of the decedent's wounds, so the claim fails.

(PCRA Court Opinion at 14) (internal citations omitted). On this record, we see no error in the PCRA court's conclusion. *See Boyd, supra*. Dr. Brown's autopsy report was not admitted into evidence; Dr. Simon's conclusions were made within a reasonable degree of scientific certainty and differed from Dr. Brown's conclusions; and trial counsel cross-examined Dr. Simon. (*See* N.T., 3/2/20, at 134-50). Accordingly, Appellant cannot succeed on his

ineffectiveness claim based upon Appellant's failure to object to the admission of a report that was not, in fact, admitted, and where Dr. Simon was available for cross-examination. ***See Brown, supra***. ***See also Sandusky, supra***; ***Poplawski, supra***.

In his final claim of ineffectiveness and his last issue on appeal, Appellant argues that trial counsel failed to subpoena Handy's medical records. Appellant asserts that these records would have impeached Handy and shown the extensive nature of Handy's wounds, when Handy had "downplayed" the severity of his injures. (Appellant's Brief at 28). Appellant claims that because the case hinged on self-defense, this issue has arguable merit and there was no reasonable basis to exclude evidence supporting the strategy. Appellant contends that he suffered prejudice as a result of counsel's actions because trial counsel could have used the records to show not only the acute danger to Handy, but the threat to Appellant. Appellant concludes that counsel was ineffective for these reasons, and this Court must grant relief. We disagree.

The PCRA court addressed this claim as follows:

> [Appellant] failed to support his boilerplate claim that trial [counsel] was ineffective for failing to subpoena Handy's medical records because he failed to provide those records to this [c]ourt, so his claim fails. Regardless, even if he had supported his claim with the records, [Appellant] cannot establish prejudice because Handy testified to the full extent of his injuries at trial.

(PCRA Court Opinion at 10). The record confirms that Handy testified that

after suffering stab wounds to the shoulder and close to his kidney, he passed out and fell to the ground due to blood loss. (**See** N.T. Trial, 3/3/20, at 17-20). Appellant has not shown how the medical records would have differed from that testimony to impeach him. Thus, we agree with the court's conclusion that Appellant cannot succeed on this ineffectiveness claim. **See Sandusky, supra**. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/2/2024